IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 2:18-CR-15-LSC-GMB |
| | ) | [WO] |
| ADRIAN SOLANO-MENDOZA | ) | |

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Pending before the court is the Motion to Suppress (Doc. 30) filed by Defendant Adrian Solano-Mendoza.   The court held an evidentiary hearing on the motion on May 30 and June 6, 2018, and has reviewed the Government's response to the motion (Doc. 46), along with the parties' evidentiary materials.    For the reasons stated herein, the Magistrate Judge RECOMMENDS that the Motion to Suppress be GRANTED in part and DENIED in part.

## I.   BACKGROUND

A Grand Jury sitting within the Middle District of Alabama indicted Solano-Mendoza on a single count for reentry into the United States by a deported alien. Doc. 14. The Grand Jury later returned a Superseding Indictment adding counts for possession of a firearm by a convicted felon and possession of a firearm while illegally residing in the United States. Doc. 24.   Solano-Mendoza claims in his motion to suppress that the Government obtained the critical evidence supporting these new charges through illegal surveillance and an illegal search of his residence. Doc. 30.   Specifically, Solano-Mendoza seeks to suppress information about the location of a certain vehicle at his residence, along with two rifles, a handgun, ammunition, and documents identifying him as a citizen of

Mexico. Doc. 30.   The court recommends that the motion to suppress be denied as to the information about the location of this vehicle and the seizure of an assault rifle, but granted as to all other items.

## II.   FACTS

The testimony and evidentiary materials offered at the evidentiary hearing on Solano-Mendoza's motion established the following facts.

### A.   Surveillance

On January 3, 2018, Scott Skillern, an Enforcement and Removal Operations Officer with the Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), conducted surveillance of a home off of County Road 173 in Chilton County, Alabama, in response to a lead received by his agency. Transcript of May 30, 2018 Hearing ("Tr. I") at 9–11.   The home was situated on a 486-acre piece of property owned by a man who does not live on the land but allows Solano-Mendoza to live there and employs him as a caretaker. Doc. 43 at 20.[1]   As Skillern approached the home on County Road 173, the roadway transitioned from a paved surface to a dirt road. Tr. I at 12.   He then drove through an open gate that had been painted green.[2] Tr. I at 16.   There were

---

[1] The owner of the property testified on Solano-Mendoza's behalf at his detention hearing, but was not called as a witness at the evidentiary hearing.   The parties do not dispute that Solano-Mendoza did not own the property on which he lived.

[2] Solano-Mendoza contends that this gate designates the outer boundary of the tract of private property on which he lived, while the Government contends that County Road 173 continues to Solano-Mendoza's home and beyond.   For purposes of this recommendation, the court assumes that County Road 173 terminates at the gate and that the road continuing on from the gate, which runs in front of the home, is not a public road.   This assumption is consistent with the videotape, admitted as Defendant's Exhibit 44 at the evidentiary hearing, which depicts the length of the roadway and appears to show a transition from a primarily dirt road before the gate to a loose aggregate surface afterwards.

2

signs posted on either side of the road indicating that trespassing onto the property was prohibited. Tr. I at 18–19.   There was another open gate on the roadway about half of a mile past the first gate, this one painted white. Tr. I at 25–27; Doc. 57-4 at 41.   Skillern initially took a right turn at this intersection, but it led him to a home that did not appear to be the residence he was looking for, so he stopped to review his notes. Tr. I at 26.

From the spot where Skillern parked, in the distance he could see a manufactured home with a white pickup truck parked outside. Tr. I at 29.   This truck matched the description of the vehicle he was looking for, so he drove back to the intersection with the white fence and down the other fork in the road. Tr. I at 30.   He drove past the front of the house on the roadway without stopping, and this vantage point gave him a better view of the truck and its personalized license plate, which matched one of the license plates identified in his paperwork. Tr. I at 30 & 36.   Skillern then drove another 50 to 75 yards past the manufactured home, turned around, and drove back by the house and out of the property the same way he had entered. Tr. I at 39.   Skillern was able to obtain an arrest warrant for Solano-Mendoza using the information he gathered during this surveillance. Tr. I at 40–41.

**B.     Arrest**

Skillern returned to Solano-Mendoza's home early on the morning of January 8, 2018, and this time he was accompanied by fellow ICE officers Chris Purdy, Waylon Hinkle, Duke McDonald, Chris Cannon, Michal Kocian, Charles Anderson, and Officer Benson, as well as a Chilton County Sheriff's Office deputy. Tr. I at 41 & 80–81.   The

3

officers were armed with service handguns, displaying their badges, and dressed in body armor and other tactical gear. Tr. I at 239–40; Transcript of June 6, 2018 Hearing ("Tr. II") at 108.   Because he had been there before, Skillern drove the lead car in a caravan of six or seven cars that carried the officers to Solano-Mendoza's home that morning. Tr. I at 41 & 46.   This time, the green gate was closed so Skillern and Hinkle slid it open to allow the cars to enter the property. Tr. I at 43.   They continued up the same road Skillern had used on January 3, through the open white gate, and toward the manufactured home. Tr. I at 45. Solano-Mendoza's truck and another car were parked outside of the home. Tr. I at 211. It was a cold and rainy morning and it was still dark when the officers arrived. Tr. I at 43 & 222.

The plan had been for the officers to set up a perimeter, knock on the door and announce their presence, break down the door, and take Solano-Mendoza into custody. Tr. I at 167.   However, just as Skillern drove past the home, the porch light illuminated, and Skillern could see that a man was standing in the doorway of the home. Tr. I at 46.   Skillern recognized the man as Solano-Mendoza and ordered him onto his knees. Tr. I at 47 & 223. At this point, Hinkle and Anderson had just parked and were approaching from the yard and also speaking to Solano-Mendoza. Tr. II at 113.   Hinkle commanded Solano-Mendoza to put his hands up. Tr. II at 113.   Hinkle, Anderson, Purdy, and Skillern were soon on the porch with Solano-Mendoza. Tr. II at 116–17.   With Solano-Mendoza kneeling on the porch, Hinkle and Anderson handcuffed him. Tr. II at 117.   To form a barrier shielding Hinkle and Anderson from any threats inside, Skillern and Purdy positioned themselves

4

between the arresting officers and the front door. Tr. II at 117.

While the officers approached the home and arrested Solano-Mendoza, a number of people gathered inside the front door of the home. Tr. I at 48 & 98; Tr. II at 117.   These people were later determined to be Solano-Mendoza's two daughters, Jasmin and Alejandra, and his wife, Paula Munoz.[3]   All three were lined up in the doorway watching the arrest. Tr. I at 102–03.   Some of the family members opened the door and were beginning to step out onto the porch,[4] so Skillern asked them in English to go back inside the home, which they did. Tr. I at 48.

As Hinkle and Anderson finished arresting Solano-Mendoza and walking him to a police vehicle parked outside, Skillern spoke to both daughters, who were fluent in English. Tr. I at 49. The daughters asked him what was happening on the porch, and in response Skillern asked them if they could "go inside and . . . explain to [them] what was happening." Tr. I at 49 & 170–71.   Skillern, Purdy, and Cannon each testified that it was necessary for their safety that they keep the family and Solano-Mendoza in separate locations while he was still on the scene. Tr. I at 189 & 217; Tr. II at 117 & 135–36.   The daughters allowed Skillern to enter the house. Tr. I at 50.

According to Skillern, Jasmin "took over the conversation" and he then spoke exclusively with her. Tr. I at 183 & 200.   Munoz corroborated the fact that Skillern spoke primarily with Jasmin and not Alejandra. Tr. I at 138.   Jasmin "looked like an adult, she

---

[3]  The only other occupant of the home at the time was Solano-Mendoza's son-in-law, who did not come to the door during the arrest. Tr. I at 160–61.
[4]  Munoz denies that anyone actually left the home and stepped onto the porch. Tr. I at 99–100.

spoke like an adult, [and] she acted like an adult," and she served "as a spokesperson" for the family. Tr. I at 183–84.   At this point, Skillern was standing in the living room, just inside the front door, with Jasmin, Alejandra, and Munoz. Tr. I at 53–54 & 200.   Skillern did not speak to Munoz. Tr. I at 200–01.   He asked Jasmin if the officers "could make a quick search [to] make sure nobody else was in the house and if [the people in the living room were] everybody that lives there." Tr. I at 52.   Her response was "sure." Tr. I at 52. At this time, Skillern did not know who the people in the room were. Tr. I at 185.   His immediate concern was to determine whether there was any threat to the officers' safety, so he identified everyone only after conducting an initial search for any other people in the home. Tr. I at 185.

Around the same time, Purdy heard one of his fellow officers say "hey, we just got consent." Tr. I at 223.   Purdy interpreted this statement to mean that the officers had consent to enter the home and "look for any other threats that may be in the home," so he and two other officers entered the home and began what they characterize as a protective sweep of the residence.[5] Tr. I at 223–24 & 246.   Purdy was particularly concerned about threats in Solano-Mendoza's house because the officers knew from his criminal history that he had possessed firearms in the past. Tr. I at 249.   It was a chaotic scene at that moment, and Purdy does not remember who told him that they had consent to enter the

---

[5]  According to Skillern, Purdy was in the home with him immediately, but Purdy testified that he did not enter the home until after hearing that they had consent. Tr. I at 155–56 & 223.   Cannon stated that Skillern and Purdy entered at the same time, which was after Solano-Mendoza was handcuffed. Tr. II at 118.   The reasonable inference is that Skillern and Purdy entered at approximately the same time, if not precisely the same moment.

home. Tr. I at 226 & 245–46.

Skillern testified that the purpose in speaking to the family was to explain what had occurred and how they could contact Solano-Mendoza, and that the reason he wanted to have this conversation inside the home was to eliminate the possibility of "family members running up to the vehicle where we just put somebody in who is getting arrested or get[ting] involved in the arrest situation."[6] Tr. I at 188.   At some point in his conversation with Jasmin, Skillern learned that she and Alejandra were Solano-Mendoza's and Munoz' daughters. Tr. I at 193.

Kocian testified that he was on the scene for an hour or an hour and a half and was first stationed outside the home to provide perimeter security. Tr. II at 4 & 26.   He was summoned by other officers after Solano-Mendoza had been arrested and placed inside the police vehicle. Tr. II at 24–25.   At that time, Cannon, Benson, and Hinkle were with Solano-Mendoza at the vehicle. Tr. II at 25.   He also saw Anderson positioned just inside the front door of the home. Tr. II at 27.   Kocian had a brief encounter with Solano-Mendoza in which he recited his *Miranda* rights in Spanish before being called into the home by a fellow officer. Tr. II at 26.   Solano-Mendoza invoked this right to counsel, and the interview terminated. Tr. II at 13.

---

[6] Cannon echoed this explanation and further explained the rationale for seeking separation between the family and Solano-Mendoza. Tr. II at 135–36 ("[Y]ou need to separate the two situations.   There's the arrest target, [and t]hen there's other people who may turn into an arrest, but may not, [and] you don't want to mix the two areas if you can help it.").

C.      **Initial Search**

As Skillern stood in the living room with Jasmin, Alejandra, and Munoz, Purdy began his search by entering the bedroom shared by Solano-Mendoza and Munoz, which was adjacent to the living room. Tr. I at 159 & 226–27.   Purdy walked into the master bathroom and its adjoining closet, and on the floor of the closet he saw an assault rifle. Tr. I at 182.   The rifle was not concealed in any way and was visible to him upon walking into the closet area. Tr. I at 227–28.   Purdy notified Hinkle that he found the weapon. Tr. I at 229.   Purdy then walked back into the living room to ask the other officers if they needed help with sweeping the rest of the home. Tr. I at 230.   This process—from Purdy's entry into the home to his return to the living room—took approximately 90 seconds. Tr. I at 230.   The next thing Purdy recalls is that one of his fellow officers read *Miranda* rights to Munoz while she was seated on a couch in the living room.[7]  Tr. I at 230–31 & 252.   Purdy did not discover any other weapons while inside the home. Tr. I at 265–66.

After his conversation with Jasmin, Skillern searched the living room for anyone who might be hiding while Purdy entered the bedroom. Tr. I at 158–59.   Once Purdy found the assault rifle in the bedroom closet, Skillern stood in the doorway between the master bedroom and the living room. Tr. I at 182.

Outside, Hinkle handcuffed Solano-Mendoza and secured him in a police vehicle within approximately the first five minutes of the officers' arrival at the residence. Tr. II at

---

[7] Purdy's recollection that Munoz was sitting in the living room when advised of her rights is contradicted by Munoz and several other officers, as discussed in the following section.

88.   McDonald then entered the home after being told that consent to enter was given. Tr. II at 89.   He does not remember who told him that they had consent. Tr. II at 89 & 96–97. He took a position in the living room facing the dining room, with his back toward the master bedroom. Tr. II at 93.   At this point, he believes Purdy and Skillern were in the master bedroom and Hinkle was in the living room speaking to Munoz. Tr. II at 94–95 & 102.   McDonald eventually entered the bedroom to take photographs after three firearms were found, but does not remember how much later that occurred. Tr. II at 98.   He photographed two rifles and a handgun on the bed. Tr. II at 98–99.   Anderson was standing just inside the front door at the time. Tr. II at 102–103.

Cannon testified that Skillern and Purdy entered the house immediately after Hinkle handcuffed Solano-Mendoza. Tr. II at 118.   Hinkle then took Solano-Mendoza to his police vehicle and had Kocian read his *Miranda* rights in Spanish. Tr. II at 118.   Because Solano-Mendoza was shivering and was not wearing a shirt, one of the officers asked him if he wanted a shirt. Tr. II at 118.   He said that he did, so Cannon entered the home for the first time and spoke with either Jasmin or Alejandra, who retrieved a hunting shirt as Cannon followed her into the master bedroom. Tr. II at 118.   While in the bedroom, another officer, whose identity Cannon cannot recall, told him that there was a firearm under the bed. Tr. II at 119–20.   At the time, Purdy was in the master bathroom area with another weapon. Tr. II at 120.   Cannon took the shirt to Solano-Mendoza, went briefly back inside with a copy of the warrant, and returned to the car to leave with Benson and Solano-Mendoza between 5:10 a.m. and 6:00 a.m. Tr. II at 120–21.   He estimates that 10

9

to 20 minutes elapsed between when he arrived on the scene and when he left with Solano-Mendoza. Tr. II at 121–22.

**D.     Interview of Munoz**

After translating for Solano-Mendoza, Kocian was summoned into the home to translate for Munoz. Tr. II at 13–14.   As he entered the home, Munoz was standing[8] in the master bathroom with Skillern and Hinkle. Tr. II at 14–15 & 29.   Hinkle directed Kocian to read Munoz' rights to her in Spanish. Tr. II at 32.   Kocian recited her *Miranda* rights in Spanish from a card and then explained the rights in "common language" to make sure she understood. Tr. II at 16.   Specifically, he advised her that she "can ask for [an] attorney. She can refuse to answer any questions at any time.   Any questions and any answers have to be—she's giving freely . . . ." Tr. II at 36.   Kocian did not advise Munoz of her right to refuse consent to a search of the home. Tr. II at 62.   Munoz told Kocian that she understood her rights. Tr. II at 16.   She was not presented with a written advisement-of-rights form. Tr. II at 66.

Next, Kocian asked several questions about Munoz' identity, including an inquiry into her immigration status. Tr. II at 33.   He then asked her for consent to search the master bedroom and bathroom area, and she agreed. Tr. II at 17 & 19.   Finally, he asked her if there were any other people or weapons in the home, and Munoz responded that there was a handgun in the nightstand next to the bed. Tr. II at 17.   By this time, the assault rifle and

---

[8] Kocian testified that they invited Munoz to sit down on the edge of the bathtub after reciting her rights to make sure she was comfortable. Tr. II at 35.

an additional hunting rifle had already been found. Tr. I at 120–21; Tr. II at 20.   Kocian remembers seeing the hunting rifle under the bed in the master bedroom at some point in the morning, but he is not the one who discovered it and is not sure when he saw it. Tr. II at 51.   Kocian believes that one of the officers was holding the assault rifle in his hands at some point while he spoke to Munoz. Tr. II at 45–46.

Munoz is 42 years old and she speaks Spanish as her first language. Tr. I at 85. After the officers entered her home, she was directed to sit in the living room but could hear that the officers were searching through drawers in the master bedroom, and she saw them searching the cabinets in the kitchen and a room on the other side of the house that her son-in-law used. Tr. I at 107, 112–13 & 119–20.   Throughout this time, there were two officers stationed in the living room just inside the front door.[9] Tr. I at–17.   An officer asked her if she could come with him to the master bathroom, and she complied. Tr. I at 116.   Her daughters remained in the living room. Tr. I at 120–21.

There were three officers in the bathroom, including one who translated from English to Spanish for her, and they told her to sit on the edge of the bathtub.[10] Tr. I at 121 & 129–30.   They then presented documents to her that belonged to her husband and related to his criminal record, along with a photograph of him. Tr. I at 121–22 & 143–44.   At this point, the officers advised her of her *Miranda* rights. Tr. I at 143.   At the time, Munoz thought that they were advising her of her rights because they were planning to arrest her

---

[9]  Based on McDonald's testimony, Anderson was one of these officers. Tr. II at 102-03.
[10]  Based on Kocain's testimony, these three were Hinkle, Skillern, and Kocian. Tr. II at 15.

also. Tr. I at 132 & 146–48.   Even though the officers were polite and were not "pushy," she was very afraid, was shaking with "tremors," and felt dizzy due to her diabetes. Tr. I at 139–40 & 122–23.   After learning that she was in the country illegally, the officers took Munoz' passport and told her to report to the ICE office in Birmingham in one hour. Tr. I at 127; Tr. II at 20.   Munoz did not believe the officers gave her "any choices as to what they were going to do inside" her home. Tr. I at 146.

At the same time, the officers searched a closet in the master bedroom and attempted to open a safe before asking Munoz what it contained and if she knew the combination. Tr. I at 123–24.   She then asked an officer if she could go to the living room and take her medication, so he brought her to the living room and directed one of her daughters to retrieve the medication. Tr. I at 125–26.   One of the officers then asked Munoz if there were any more weapons in the home, but Munoz remembers that this was after they had found the two rifles and handgun in the master bedroom. Tr. I at 126.   According to Munoz, no one ever asked her for consent to search the house. Tr. I at 126–27.   She estimated that they were at the house from 5:30 a.m. to 8:00 a.m. Tr. I at 134.

### III.   DISCUSSION

Solano-Mendoza presents two justifications for invoking the exclusionary rule to suppress the Government's evidence against him: (1) the surveillance on January 3, 2018 was illegal because it encroached on the curtilage of his home; and (2) the officers had no legal authority to enter his home and search it on January 8, 2018. Doc. 30 at 5.   Solano-Mendoza's motion oversimplifies the issues presented, as the second justification involves

12

intertwined inquiries including exigency, apparent authority, and voluntariness.   For the reasons explained below, the court finds that the surveillance on January 3 was accomplished legally, that the officers were legally inside the home on January 8 solely for the purpose of accomplishing a protective sweep of the residence, and that the officers recovered an assault rifle during the protective sweep.   As to the other items identified in the motion to suppress, the Government has failed to carry its burden of proving that any exception to the warrant requirement applies, and therefore the court concludes that these items were unlawfully seized pursuant to a warrantless search of Solano-Mendoza's home.

## A.   Curtilage

Solano-Mendoza first argues that Skillern's surveillance of his home on January 3 violated the Fourth Amendment.   It did not.   The court finds that the January 3 surveillance did not infringe upon Solano-Mendoza's constitutional rights and therefore does not reach the question of whether an exception to the exclusionary rule might apply even if the surveillance had been improper.

Solano-Mendoza bears the burden of proving that he had a legitimate expectation of privacy in the area Skillern searched. *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008).   "A person has a legitimate expectation of privacy if (1) he has a subjective expectation of privacy, and (2) society is prepared to recognize that expectation as objectively reasonable." *Id.* (citing *United States v. Segura–Baltazar*, 448 F.3d 1281, 1286 (11th Cir. 2006)).   In this instance, Solano-Mendoza's argument depends on whether the roadway directly in front of his home is within the home's curtilage because that is where

Skillern was located when viewing his license plate.

The Fourth Amendment protects both the home and its curtilage—that is, any other area so intimately associated with the home that it "should be treated as the home itself." *United States v. Dunn*, 480 U.S. 294, 300 (1987).   The distinction between curtilage and open fields has survived since the common law. *Oliver v. United States*, 466 U.S. 170, 180 (1984).   Four primary factors define constitutionally protected curtilage: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *Dunn*, 480 U.S. at 301.   These factors are "useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.*   Here, all relevant considerations lead inexorably to the conclusion that the roadway passing by the front of Solano-Mendoza's home sits outside of its curtilage.


**[REST OF THIS PAGE INTENTIONALLY LEFT BLANK]**

Two photographs introduced into evidence during the evidentiary hearing frame the analysis to follow.   The first is an aerial view:



Doc. 57-4 at 10.   The area depicted in the photograph is only one portion of the larger tract on which Solano-Mendoza lived and served as caretaker.   His home lies in the center of the frame, just above the roadway in question.   Adjoining the home on the right is a small parking pad, and to the right near the outside of the frame are barns, a tractor shed, and a horse field. Tr. II at 10–11.   The public roadway lies well outside of the frame to the left.

Tr. I at 12–14.

The second instructive image depicts Solano-Mendoza's home from the edge of the roadway on approach:



Doc. 57-4 at 44.

Having established this context, the court turns to the *Dunn* factors.  The road is certainly proximate to the home, passing within a few steps of the front porch.  And the home is on property posted as private and separated from the public roadway by half a mile and at least two fences.  But, critically, a decorative wooden fence has been installed between the road and the home, as depicted above, and this fence is the only apparent

attempt to protect the house from observation in any direction.   This delineation is the strongest evidence that Solano-Mendoza could not reasonably expect for the road—on the other side of his fence—to enjoy the same privacy protections as his home.   He also has placed a picnic table on the inside of the fence, in an area that by all appearances is a traditional front yard.   In contrast, there is no indication that Solano-Mendoza maintains the roadway adjacent to his home differently from its condition throughout the length of the road.   And this is not a dedicated driveway terminating at his house.   The road continues well past Solano-Mendoza's home to other parts of the farm and provides access for the owner of the property and his guests to travel to his barns, tractor shed, and horse field.   The *Dunn* factors, on the whole, point to a finding that the road lies outside of the home's curtilage.

Not only are the *Dunn* factors instructive in the abstract, but the *Dunn* facts are strikingly similar to those presented here.   In *Dunn*, law enforcement officers had reason to believe that a 198-acre ranch property surrounded by a perimeter fence concealed an amphetamine manufacturing operation. *Dunn*, 480 U.S. at 297.   The property featured a number of interior fences and a residence located approximately half of a mile from the public roadway. *Id.*   There was a fence around the residence and a nearby greenhouse. *Id.* Two barns sat about 50 yards outside this enclosure surrounded by another fence. *Id.* During their investigation, law enforcement officers made a warrantless entry onto the property, crossing the perimeter fence and interior fences. *Id.*   They approached the barns and looked inside with the aid of a flashlight, where they saw evidence of amphetamine

manufacturing. *Id.* at 298.

In *Dunn*, the distance between the house and barn "support[ed] no inference that the barn should be treated as an adjunct of the house." *Id.* at 302.   And the barn's location outside the fence surrounding the home was significant in that this fence "serves to demark a specific area of land immediately adjacent to the house that is readily identifiable as part and parcel of the house." *Id.*   The officers also "possessed objective data indicating that the barn was not being used for intimate activities of the home"—principally, they had good reason to suspect that it was being used as a laboratory because they could smell chemicals and hear machinery running. *Id.* at 302–03.   Finally, the court noted that the homeowners did little to protect the barn from observation, as the interior fences were typical ranch fences designed to control livestock. *Id.* at 303.   On these facts, the *Dunn* court had "little difficulty in concluding that [the barn and the surrounding] area lay outside the curtilage of the ranch house." *Id.* at 301.   "It follows that no constitutional violation occurred here when the officers crossed over respondent's ranch-style perimeter fence, and over several similarly constructed interior fences, prior to stopping at the locked front gate of the barn." *Id.* at 304.

*Dunn* compels the same result here.   While the barn in *Dunn* was located farther from the residence than the road in front of Solano-Mendoza's home, both the barn and road sat outside the homes' enclosures.   Just as with the barn in *Dunn*, there is ample evidence that the road is not intimately associated with Solano-Mendoza's home because it does not terminate at the home and is instead used for accessing other parts of the

property.   And there is no information in the record indicating that the interior fences Skillern crossed differ in any material respect from the fences in *Dunn* or that Solano-Mendoza took any other affirmative steps to protect his home from observation. *See also Oliver*, 466 U.S. at 182 (finding no expectation of privacy on open fields despite affirmative concealment such as erecting fences and posting "No Trespassing" signs around the property).   Neither *Florida v. Jardines*, 569 U.S. 1, 7 (2013), in which an officer and his canine companion intruded onto the front porch of a home to sniff for narcotics, nor *Collins v. Virginia*, 584 U.S. ___ (2018), in which an officer walked up a private driveway to view a covered motorcycle parked in a partially enclosed portion of the driveway abutting the home, compels another result.   Solano-Mendoza has not carried his burden of proving that the roadway sits within the curtilage of his home such that it carries Fourth Amendment protections.   As a result, Skillern was lawfully on the roadway when he conducted surveillance on January 3, and Solano-Mendoza's motion to suppress the information Skillern gained during this surveillance is due to be denied.

## B.   Entry and Protective Sweep

It is a bedrock principal of the law that "searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980). Indeed, "the Fourth Amendment has drawn a firm line at the entrance to the house." *Id.* at 590.   "Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006).   And the "reasonableness analysis must be

conducted for each search and seizure that is alleged to be unconstitutional." *Cnty. of Los Angeles, Calif. v. Mendez*, 137 S. Ct. 1539, 1546 (2017).   Here, the officers' entry into the home and any subsequent search must be independently analyzed for their reasonableness.

Two exceptions may be applicable to the entry and initial search of Solano-Mendoza's home.   One applies "when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained." *Georgia v. Randolph*, 547 U.S. 103, 106 (2006).   The other exception is for a protective sweep, which is defined as "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). "Under either consent or exigent circumstances, an officer who conducts a warrantless search or seizure inside the home bears the burden of proving that his conduct was justified." *McClish v. Nugent*, 483 F.3d 1231, 1241 (11th Cir. 2007).   The court addresses each exception in turn.

### 1.   *Consent to Enter and Search*

The Government contends that one of Solano-Mendoza's daughters consented to the officers' entry into the home and their initial search inside.   Valid third-party consent requires two elements: authority and voluntariness. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990); *United States v. Sanchez*, 608 F.3d 685, 689 (10th Cir. 2010).   A third party may have actual authority by virtue of her possession of "common authority over or other sufficient relationship to the premises or effects to be inspected." *United States v. Matlock*,

415 U.S. 164, 171 (1974).   Stated more specifically, this authority

> rests . . . on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Id.* at 171 n.7.   However, even in the absence of actual authority, consent may still be valid if a third party has apparent authority.   That is, where "the facts available to the officer at the moment warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." *Rodriguez*, 497 U.S. at 188 (internal quotation marks omitted).   Whether actual or apparent, the government bears the burden of establishing authority to consent. *See id.* at 181.

Skillern testified that Jasmin, Solano-Mendoza's youngest daughter, gave verbal consent for him to conduct a search to make sure no one else was in the house.   The fact that Jasmin was only 13 years old at the time of the search is not outcome determinative because the Eleventh Circuit has held that minor children may, at least under some circumstances, give third-party consent to a search. *See Lenz v. Winburn*, 51 F.3d 1540, 1548 (11th Cir. 1995).   Other circuits have agreed. *See, e.g.*, *Sanchez*, 608 F.3d at 690; *United States v. Clutter*, 914 F.2d 775 (6th Cir. 1990).   There is no bright-line rule for the appropriate age at which a minor may give third-party consent.   Instead, the courts addressing this fact-specific inquiry have noted various indicia of authority in this context. The typical factors include: (1) whether the minor is "routinely in charge" of the home;[11]

---

[11] *See, e.g.*, *Sanchez*, 608 F.3d at 690; *United States v. Broaden*, 116 F.3d 1486 (9th Cir. 1997) (noting that

(2) whether the minor was in charge of the home during the incident in question;[12] (3) the disparate authority between parents and children;[13] (4) whether the minor has been the victim of a crime or requests the search;[14] (5) whether the search is otherwise for the welfare and benefit of the minor;[15] (6) the scope and location of the search in the home;[16] and (7) the age and maturity level of the minor.[17]

---

the parent regularly "entrusted [the child, a babysitter,] with substantial authority over his children and his home"); *Clutter*, 914 F.2d at 778 (observing that 12- and 14-year-old children are "routinely left in exclusive control of the house").

[12] *See, e.g.*, *Wallace v. State*, 63 A.3d 1192, 1195 (Del. 2012) (finding valid consent to a probation officer's "walk through" where the minor had "authority to invite a friend over without parental approval"); *Abdella v. O'Toole*, 343 F. Supp. 2d 129, 137 (D. Conn. 2004) (finding no third-party consent where the record did not "show that [the child] had responsibility for her home or that she had permission to access the private areas searched by police"); *United States v. Gutierrez-Hermosillo*, 142 F.3d 1225, 1231 (10th Cir. 1998) (finding consent where a minor opened the door to a motel room).

[13] *See, e.g.*, *People v. Jacobs*, 43 Cal. 3d 472, 482 (Cal. 1987) (applying *Matlock* and observing that "children . . . do not have coequal dominion over the family home" because "parents normally retain control of the home as well as the power to rescind the authority they have given").

[14] *See, e.g.*, *United States v. Peden*, 2007 WL 2318977, at *5 (E.D. Cal. Aug. 13, 2007) (finding consent where 14- and 17-year-old children were both victims of a crime and invited the officers into the home); *Abdella*, 343 F. Supp. 2d at 135 ("Typically . . . the child has contacted police and requested the search, or the child is a victim of, or witness to, the crime that led to the search."); *Jacobs*, 43 Cal. 3d at 483 (affirming an otherwise illegal search where the search was "made at the request of a child or when a child is the victim of or a witness to a crime").

[15] *See, e.g.*, *Lenz*, 51 F.3d at 1542–44 (finding valid consent where child protective services employees entered grandparents' and father's home due to their suspicion of child abuse).

[16] *See, e.g.*, *Georgia v. Randolph*, 547 U.S. 103, 112 (2006) (observing that "a child of eight might well be considered to have the power to consent to the police crossing the threshold into that part of the house . . . but no one would reasonably expect such a child to be in a position to authorize anyone to rummage through his parents' bedroom") (citation omitted); *Limon v. State*, 340 S.W.3d 753, 758 (Tenn. Crim. App. 2011) (approving of minor's consent because "it was reasonable to rely on a teenager's authority to consent to such a limited scope of entry"); *State v. Tomlinson*, 254 Wis. 2d 502, 522 (2002) ("A high school-aged child will likely have at least some authority to allow limited entry into the home."); *State v. Griffin*, 756 S.W.2d 475, 484 (Mo. 1988) (allowing a minor to consent to entry into a common area); *Jacobs*, 43 Cal. 3d at 483 ("In some circumstances, a teenager may possess sufficient authority to allow the police to enter and look about common areas."); *In re Anthony F.*, 293 Md. 146, 150–51 (1982) (finding consent where a 16-year-old resident allowed police "to stand just inside the front door"); *State v. Jones*, 22 Wash. App. 447, 451–52 (1979) (affirming entry into a living room).

[17] Courts regularly consider the child's age, maturity, and intelligence level, and have observed that "[a]s a child advances in age, she acquires greater discretion to admit visitors on her own authority." *Jacobs*, 43 Cal. 3d at 483.

Applying *Matlock*'s joint-access-or-control test, the court concludes that, while Jasmin may have had the authority to consent to the officers' entry into the living room for the purpose of gathering information about the arrest, she did not have actual or apparent authority to allow a search of the entire premises.   This is because there is a substantial difference between a child's authority over common areas like an entryway or living room and private areas like a parent's bedroom.   In *Matlock*, the Supreme Court made clear that it must be "reasonable to recognize" that any of the residents has the right to permit inspection of the area to be searched "in his own right" such that other residents have assumed the risk that the particular area might be searched. *Matlock*, 415 U.S. at 171 n.7. Indeed, *Matlock*'s use of the phrase "common area" highlights this distinction.   Here, the court cannot conclude, based on the record now before it, that it was reasonable for Skillern to assume that Jasmin, at 13, had mutual use and joint access or control of her parents' bedroom such that it would be clear to her parents that she could permit inspection of the room in her own right.

An application of the customary post-*Matlock* factors buttresses this conclusion. Skillern testified that Jasmin appeared physically and emotionally mature for her age, such that he mistakenly believed she was an adult.   He also noted that Jasmin dominated the conversation and acted as a "spokesman" for the family.   However, there is no evidence from which the court could infer that Jasmin was routinely in charge of the home or that she was in charge of the home during the incident at hand.   In fact, because there were two other people in the room who both appeared to Skillern to be adults, it could be inferred

from the circumstances that Jasmin was not—at least exclusively—in charge of the home. Certainly, in a coequal tenancy situation, the better practice would be give each tenant the opportunity to refuse consent to a search. *See Randolph*, 547 U.S. at 122–23 (holding that a "present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant").   Of course, the situation here was not one of coequal tenancy, but of inherently unequal tenancy due to the disparate authority between Munoz and her children.

Two of the other common considerations relevant to a minor's authority to consent to a search—whether the child is a victim of a crime or the search is for the child's benefit—are not present here.   In *Lenz*, the Eleventh Circuit held that a nine-year-old child could consent to allow two child protective services employees to enter her grandparents' and father's home.   The entry, however, was for the purpose of retrieving the child's belongings after an investigation by the state agency concluded that she was being abused by the father and grandparents.   In addition to the fact that one of the workers testified that the child invited them into the home, the court also noted that she had "free access to the living room," and could therefore consent to the entry. *Lenz*, 51 F.3d at 1549.   Thus, the circumstances in *Lenz*—an administrative search for the purpose of moving a child abuse victim away from her abusers—are clearly distinguishable from the case here, where Jasmin was not a victim of a crime and did not request the search.   *Sanchez* is similarly distinguishable.   There, the minor child testified that (1) she had access to the entire home, (2) was in charge of the home when police visited, and (3) her parents had placed "no

24

restrictions" on her behavior in the home. *Sanchez*, 608 F.3d at 689.   Here, Jasmin did not testify at the evidentiary hearing, and there is no other evidence in the record regarding her access to specific areas of the home and any restrictions her parents may have placed on her.

The final relevant factor is the location and scope of the search.   Jasmin may well have had the actual authority to consent to the officers' entry into the living room because of its status as a common area and entryway.   But Jasmin's authority did not necessarily extend to her parents' bedroom or any other private area of the home, and the record is devoid of information tending to prove mutual use and control. *See, e.g.*, *Randolph*, 547 U.S. at 112 (noting that a child with authority to consent to entry into a home is not necessarily "in a position to authorize anyone to rummage through his parents' bedroom"). Considering all of these factors, it was unreasonable based on the information Skillern had at the time for him to assume that Jasmin did have the authority to consent to a search of the master bedroom or other private areas of the home.

The court's analysis of this issue is guided by a "constant element in assessing Fourth Amendment reasonableness in the consent cases," which "is the great significance given to widely shared societal expectations." *Randolph*, 547 U.S. at 111.   Here, it was not reasonable for Skillern to question only Jasmin and fail to address Munoz, the sole adult in the room standing only a few feet away.   "The government cannot establish that its agents reasonably relied upon a third party's apparent authority if agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry." *United States*

25

*v. Waller*, 426 F.3d 838, 846 (6th Cir. 2005); *see also United States v. Kimoana*, 383 F.3d 1215, 1222 (10th Cir. 2004) ("[W]here an officer is presented with ambiguous facts related to authority, he or she has a duty to investigate further before relying on the consent."). Here, faced with three people he did not know in a home who had all demonstrated concern over Solano-Mendoza's arrest, Skillern spoke only to Jasmin, who was the youngest of the three.   Under these circumstances, and even in the heat of the moment, it was not reasonable for Skillern to fail to ask the identity of the three people in the room, if the owner of the home was present, if one of the three was Solano-Mendoza's wife, or if anyone objected to a search.   Any of these questions would have led Skillern to the one person in the room who undeniably had actual authority to consent to a search—Solano-Mendoza's wife and the mother of the two girls standing before him.   Accordingly, the court cannot conclude, even in the absence of actual authority, that Skillern reasonably believed that Jasmin had the authority to consent to a search of her parents' bedroom. *See Rodriguez*, 497 U.S. at 189.   The Government has failed to carry its burden of proving the validity of Jasmin's consent to the entry into the home and the initial search.

### 2.   *Protective Sweep*

Although the court finds that Jasmin's consent was not valid, this does not end the inquiry.   This is because, independent of any consent, Skillern and Purdy were justified in making entry into the home during or immediately after arresting Solano-Mendoza on the porch in order to conduct a limited protective sweep of the premises.   A protective sweep incident to arrest has long been recognized as a legitimate police function designed to

protect officers from counter-attack. *Maryland v. Buie*, 494 U.S. 325, 334 (1990). Determining the legality of a protective sweep nevertheless implicates "two deeply important interests—the lives of law enforcement officers and the constitutional right of the people to be secure in their homes under the Fourth Amendment." *United States v. Delancy*, 502 F.3d 1297, 1307 (11th Cir. 2007). As a result, the Supreme Court has arrived at a careful balance—without probable cause or even reasonable suspicion, officers may search "spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Buie*, 494 U.S. at 334. Beyond those spaces, any search must be based on "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.*

The Eleventh Circuit often has had the occasion to pass judgment on the sufficiency of the articulated facts supporting a protective sweep. For example, in *United States v. Burgos*, the court affirmed the constitutionality of a protective sweep of a home, noting that "officers who have lawfully apprehended a suspect on a portion of a structure (here it was an open porch built as a part of the home) which they have reason to believe contains dangerous third persons who might pose a threat to their safety have a right to conduct a reasonable security check of such premises." *United States v. Burgos*, 720 F.2d 1520, 1526 (11th Cir. 1983). In *Burgos*, the officers' belief that they were in danger was based on their surveillance, only a short time before, of two suspects (only one of whom had been taken into custody) unloading boxes of firearms into the home. *Id.* Such strong proof of

27

guns and accomplices together in the home undeniably exposed the officers in *Burgos* to substantial risk.

While the *Burgos* facts are the archetypal justification for a protective sweep, the Eleventh Circuit has approved similar searches on much less substantial showings.   In *United States v. Williams*, for example, agents executing a search warrant made nearly simultaneous entry of a home (where they took the subject into custody) and a nearby outbuilding. *United States v. Williams*, 871 F.3d 1197, 1200 (11th Cir. 2017).   The Eleventh Circuit affirmed the search of the outbuilding as a valid protective sweep. *Id.* at 1202.   In holding that the circumstances "suggested that there may be more people present on the premises . . . who could pose a threat to the arresting agents' safety," the Eleventh Circuit noted that the subject's car and two other cars were parked in the driveway when they searched the property, that the layout and proximity of the outbuilding indicated it could be occupied, and that previous surveillance had indicated potential drug trafficking activities either at the house or the outbuilding. *Id.*

In *United States v. Hromada*, law enforcement officers had been given a tip by a confidential informant that the defendant was growing and distributing marijuana from his residence. *United States v. Hromada*, 49 F.3d 685, 687 (11th Cir. 1995).   It had been some time since the informant had been in the house, however, so the officers launched an investigation that eventually yielded evidence of continued drug transactions. *Id.*   The investigation also revealed that the defendant likely lived with his girlfriend in the home and that he consulted with another man on at least one occasion about the prices he should

charge for his marijuana. *Id.*   The officers obtained a warrant for the defendant's arrest and had to break down the door when the defendant refused to open it. *Id.*   They then fanned out throughout the house to conduct a protective sweep, finding the defendant's girlfriend and roommate, along with extensive evidence of a marijuana growing operation. *Id.* at 688.   The Eleventh Circuit held this protective sweep to be valid because the officers had reason to believe that the defendant's girlfriend and roommate were in the house and "[g]uns and violence go hand-in-hand with illegal drug operations." *Id.* at 689; *cf. United States v. Hollis*, 780 F.3d 1064, 1069 (11th Cir. 2015) (holding protective sweep to be reasonable based on suspicion that the location was a heavily used and frequently occupied "drug house"); *see also United States v. Tobin*, 923 F.2d 1506, 1513 (11th Cir. 1991) ("The fact that there were three vehicles on the scene coupled with [one defendant's] lying about [the other's ] presence clearly gave rise to a reasonable belief that someone else could be hiding in the house.").   On the whole, these cases stand in sharp contrast to those in which the Eleventh Circuit has invalidated a protective sweep. *See, e.g.*, *United States v. Chaves*, 169 F.3d 687, 692 (11th Cir. 1999) (holding that officers lacked specific and articulable facts supporting a protective sweep when they sat in their police cars outside a warehouse for 45 minutes before making entry); *United States v. Scott*, 517 F. App'x 647, 649 (11th Cir. 2013) (invalidating protective sweep where officers could not articulate any basis to conclude that anyone else was inside the home).[18]

---

[18] A number of unpublished Eleventh Circuit opinions treat this issue similarly.   *United States v. Norman* involved a protective sweep that occurred after law enforcement officers arrested a woman as she stepped outside of her home. *United States v. Norman*, 638 F. App'x 934, 938 (11th Cir. 2016).   The arrest was

Consistent with Eleventh Circuit precedent, the court concludes that there were facts and rational inferences justifying the protective sweep of Solano-Mendoza's home.   The officers arrested Solano-Mendoza in the early-morning dark pursuant to a valid arrest warrant.   The fact that there were two cars parked outside tends to show that there were additional occupants of the home at that time, as it did in *Williams* and *Tobin*.   And the officers had actual knowledge confirming this fact, as they could see an undetermined number of additional people stacking up at the threshold during the arrest, as Munoz corroborated.

Skillern, Purdy, and Cannon also articulated their belief that anyone in the home

---

pursuant to a valid arrest warrant for a fraud scheme involving identity theft. *Id.* at 936.   Before entering the home, officers could see a woman and at least one pit bull in a cage inside the home. *Id.* at 938.   They also "had reason to believe that [the subject's boyfriend], who had a criminal record and was believed to be involved in the identify theft scheme, could be inside and could fear arrest." *Id.*   The Eleventh Circuit held in a *per curiam* opinion that "[t]hese details provided specific, articulable facts under which officers could reasonably justify a limited sweep in order to secure their safety." *Id.*

In the same vein, the Eleventh Circuit panel sitting in *United States v. Sanders* relied on the officers' knowledge that the defendant "was a member of a gang and that gang members were known to be in close proximity with each other" in affirming a protective sweep. *United States v. Sanders*, 712 F. App'x 956, 959 (11th Cir. 2017).   The trial court in *Sanders* found that the defendant had an arrest warrant for aggravated assault and was known to be a member of a street gang and in frequent contact with other gang members. *United States v. Sanders*, 2016 WL 3746181, at *1 (N.D. Ga. June 6, 2016), *report and recommendation adopted*, 2016 WL 3766334 (N.D. Ga. July 8, 2016), *aff'd*, 712 F. App'x 956 (11th Cir. 2017).   During the arrest, both the defendant and his girlfriend were taken into custody, and no other individuals had been seen at the residence. *Id.* at *2.   When asked, the girlfriend confirmed that no one else was present. *Id.*   The officers nevertheless conducted a protective sweep of the residence, including an upstairs bedroom where they recovered a firearm. *Id.* at *3.   On these facts, the Eleventh Circuit affirmed the district court's finding "that the officers' belief that the apartment may not be empty was reasonable in light of the information available to the officers." *Sanders*, 712 F. App'x at 959; *see also United States v. Jackson*, 618 F. App'x 472, 478 (11th Cir. 2015) (holding that articulable facts supported protective sweep where officers believed an individual could have been hiding in a partially concealed area of an apartment); *United States v. Alatorre*, 863 F.3d 810, 812 (8th Cir. 2017) (affirming protective sweep based on articulable facts including the defendant's criminal history of gun possession and circumstances indicating additional people were inside the home); *United States v. Biggs*, 70 F.3d 913, 916 (6th Cir. 1995) (affirming "warrantless search of a motel room 20-75 feet from the arrest site once they had the defendant under their control" based on articulable facts including the defendant's previous firearm possession, a tip that he would be meeting someone at the motel, and the fact that the door to the room remained open).

posed a danger to the officers outside, explaining that the basis for maintaining separation between the family and Solano-Mendoza was to prevent conflict with the officers, who had been placed in a particularly precarious position as they attempted to effectuate Solano-Mendoza's arrest on the porch only a few steps from the open front door of the home. *See, e.g.*, *United States v. Lesane*, 685 F. App'x 705, 722 (11th Cir. 2017) (noting line-of-sight from interior occupants to law enforcement officers among reasonable safety concerns supporting protective sweep).   The location of the arrest forced two of the officers to put their backs to the door, and two others to place themselves between the arresting officers and the door to shield the first two from any threats inside.   The officers' lack of information about the interior configuration of the home put them at a further disadvantage. *See, e.g.*, *Hromada*, 49 F.3d at 690 (citing *Buie*, 494 U.S. at 333)) (observing that "the dangers presented by in-home arrests are often greater than those conducted on the street due to the 'home turf' advantage the suspect has over the police").   Under these circumstances, the court finds the officers' safety concerns to be legitimate.

Moreover, whether Solano-Mendoza was already in handcuffs and under police control at the time of the protective sweep matters little in a rapidly developing situation such as this one, where the officers had intended to make an organized tactical approach to the property but instead had to make the split-second decision to arrest their subject on the porch as they were arriving, barely a step from their cars.   In a situation Purdy aptly described as chaotic, Solano-Mendoza's custodial status may have minimized the risk he posed, but it did little to cure concerns of an ambush from third parties.   This is the primary

risk a protective sweep guards against.   And there is no evidence before the court on which it could conclude that the officers could have been expected to arrive, effectuate the arrest, and be gone from the property quick enough to have avoided that risk.   Meaningful security concerns often persist as long as the officers remain on scene.   Solano-Mendoza's arrest did not vitiate those concerns. *See, e.g.*, *Tobin*, 923 F.2d at 1508 (upholding post-arrest protective sweep).

In addition, while the Government presented only limited information on the nature of Solano-Mendoza's criminal history, Purdy testified that he had been instructed prior to arriving on the scene that Solano-Mendoza had a history of using firearms.   This fact magnified the officers' reasonable concern for their safety.   On these facts, the Government has carried its burden of proving that the officers were justified in conducting a limited protective sweep inside the home to assure themselves that there were no dangerous individuals hiding inside.   Any other finding would tip the scales toward exposing the officers to unnecessary and unreasonable danger.

### 3.   *Scope of Protective Sweep*

Any protective sweep, even if legally justified, must still be carefully circumscribed if it is to pass constitutional muster.   A protective sweep is only a "quick and limited search of premises" and must be "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Buie*, 494 U.S. at 327.   And it must last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335–36.   If operating

within these limitations, however, officers may lawfully seize evidence and contraband in plain view. *E.g.*, *Tobin*, 923 F.2d at 1513 (citations omitted); *United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir. 2006) (citations omitted).

Purdy testified that he began to conduct a protective sweep of Solano-Mendoza's home immediately upon entering it, that his first move was to fan out into what he later determined to be the master bedroom and its adjoining closet and bathroom, and that once there he immediately noticed the assault rifle uncovered on the floor of the closet. After he located this rifle, Purdy stayed in the master bathroom to secure it until Hinkle arrived. All of this occurred in about 90 seconds. On these facts, if the court credits them, there can be no serious debate that Purdy seized the assault rifle, which was visible in plain view, while in the process of conducting a valid protective sweep.

Upon careful consideration, the court does find Purdy's testimony on his role in the protective sweep to be credible. As an initial matter, Purdy's testimony is substantially, if not entirely, uncontroverted. The only arguable contradiction comes from Munoz, who testified that after the officers entered her home she could hear that they were opening and closing drawers in the bedside table and dresser. This is legally significant since "a deeper warrantless search, looking into drawers and cabinets" is an unjustifiable expansion of an otherwise lawful protective sweep. *Tobin*, 923 F.2d at 1513 (citing *Chimel v. California*, 395 U.S. 752, 763 (1969)). But Munoz was not pressed on the precise timeline for these events, and the court finds it unlikely that, if the officers did begin to look through the drawers, it happened within the first 90 seconds of the entry into the home, when the

officers' primary concern was to secure the scene.   Certainly Munoz did not specify that this happened in the first 90 seconds.

Moreover, even assuming Munoz' claim that she heard drawers opening in her bedroom is in actual conflict with Purdy's testimony on the first few moments of the protective sweep, the court credits Purdy's testimony as laying out the more credible version of the events.   In resolving this credibility determination, the court is guided by the same factors traditionally found to be determinative of credibility in the eyes of the jury, including the demeanor and apparent candor of the witnesses, any personal interest or other reason to fabricate testimony, whether the witness seemed to have a good memory, whether the witness had the opportunity to observe the things he or she testified about, and any conflicts between the testimony and other evidence. *See, e.g.*, *Gallego v. United States*, 174 F.3d 1196, 1198 (11th Cir. 1999) (remanding for the trial court's failure to consider "internal consistency of the defendant's testimony, or his candor or demeanor on the stand" in assessing competing credibility of witnesses); 11th Cir. Pattern Jury Instruction 3.4 (2013), Credibility of Witnesses.

The court observed Purdy's demeanor on the stand and found him to be candid and confident of his memory, which was precise and detailed.   While Munoz' relative hesitancy appeared to be attributable to a language barrier, her memory of the sequence of events that morning was less precise.   This is understandable.   January 8 was another day at work for Purdy, but a traumatic event for Munoz.   Munoz was under a significant amount of stress on the morning of her husband's arrest and this stress was compounded

by her diabetes and other health problems that manifested with symptoms ranging from blurred vision to trembling.   The court may reasonably infer that her condition impacted her perception of the morning's events.   Munoz also was limited in her ability to observe the search, as she testified to being seated in the living room facing away from her bedroom where she could hear but not see what was happening inside.   Finally, Munoz has an obvious motivation to fabricate her testimony, as it could result in the suppression of substantial evidence against her husband.   For all of these reasons, even if Munoz' testimony can be interpreted as contradicting Purdy's, the court credits Purdy's version and recommends the denial of Solano-Mendoza's motion to suppress the assault rifle on this basis.

After those first 90 seconds, however, the timeline is fuzzy.   No one testified to recovering the hunting rifle, handgun, or ammunition or identified who did.   Although the photograph is not in evidence, McDonald testified that he photographed two rifles and a handgun that had been placed on the master bed at an undetermined time.   Cannon testified that he entered the house to retrieve a shirt for Solano-Mendoza while Purdy was in the bathroom with another weapon, but did not explain whether this occurred during the protective sweep or at a later time.   The record is replete with these gaps in factual development, as will be discussed in more detail below.

**C.    Subsequent Search**

While the Government presented sufficient evidence during the evidentiary hearing to show that Purdy recovered the assault rifle during a legal protective sweep, it largely

ignored the rest of the evidence seized from Solano-Mendoza's home.   Despite presenting testimony from five officers, none testified to recovering the hunting rifle.   Purdy thought it was a shotgun, not a rifle. Tr. I at 235.   Cannon testified to seeing a firearm under the bed, but did not say whether it was a handgun, a rifle, or a shotgun.   And when did he see it?   Who found it, and was that officer legally entitled to be where he was at the time? Was it always visible under the bed, or had it been moved?   Kocian said a handgun was found in the nightstand, but by whom?   And when?   No witness said a word about any ammunition that may have been recovered.   And no officer identified the "papers" Solano-Mendoza has moved to suppress—what precisely were these documents, where were they recovered, and when?   Many of these questions could have been answered by the introduction of a written property report or photographs of the items before they were disturbed, or even a systematic discussion of the evidence seized.   It was the Government's burden to resolve these discrepancies if it is to establish the legality of its officers' warrantless search. *E.g.*, *United States v. Holloway*, 290 F.3d 1331, 1337 (11th Cir. 2002) (citing *United States v. Jeffers*, 342 U.S. 48, 51 (1951)).   The Government has not met that burden, and thus the court can only conclude that the hunting rifle, handgun, ammunition, and papers were discovered pursuant to an illegal search of Solano-Mendoza's home.

**D.   Consent**

The Government contends that Munoz consented to a search of her bedroom and bathroom, which she denies.   The court concludes that Munoz did, in fact, consent to the

search.[19]   But whenever a consent follows an improper search, the court must conduct two separate inquiries, asking whether the consent was voluntary and whether "it was the 'fruit of the poisonous tree'—the product of an illegal entry." *Delancy*, 502 F.3d at 1308.   "This two step approach is mandatory, and the government bears the burden on both issues." *Id.* As explained below, Munoz did not voluntarily consent to the search and at any rate her consent, even if voluntary, would have been tainted by the prior illegal search.

Consent is voluntary if it is "the product of an 'essentially free and unconstrained choice.'" *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir. 2001) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)).   "Whether a suspect voluntarily gave consent to a search is a question of fact to be determined by the totality of the circumstances." *United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989) (citing *Schneckloth*, 412 U.S. at 249–50).   "The government bears the burden of proving both the existence of consent" and that it was voluntarily given. *Id.* at 798 (citing *United States v. Massell*, 823 F.2d 1503, 1507 (11th Cir. 1987)).   Factors relevant to the voluntariness inquiry include the

> voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the

---

[19] Munoz and Kocian gave materially similar accounts of their conversation in the master bathroom with the notable exception that Munoz maintains that she was not asked to consent to a search.   Based on this corroboration and their demeanor on the stand, the court found the testimony of both witnesses generally to be credible.   However, based on the stress of the morning, as discussed above, and Munoz' lack of education, as discussed below, combined with Kocian's unequivocal testimony, the court concludes that the consent did occur but that Munoz merely did not understand what was being asked of her since, after all, the officers had no discernible motivation not to at least ask for consent, knowing that it could be a panacea for any illegalities.

defendant's belief that no incriminating evidence will be found.

*Id.* at 798–99 (citing *United States v. Chemaly*, 741 F.2d 1346, 1352 (11th Cir. 1984)).

The court concludes based on these factors that Munoz' consent was not voluntary. While Munoz testified that the officers were polite and not "pushy," and thus there is no evidence of explicitly coercive police procedure, the rest of the *Blake* factors establish that Munoz was not in a position where a "reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 436 (1991). She had just watched them arrest her husband and search her home, had been directed to sit in her living room then summoned to her bathroom, where three armed adult men waited, and then had been asked pointed questions about her immigration status—all while armed officers blocked the doorway of her home. The court finds Munoz' testimony that she did not believe she could keep the officers out of her home to be objectively reasonable. Under the totality of the circumstances, Munoz' custodial status was closer to involuntary than voluntary, and a reasonable person in her shoes would not have felt free to decline the officers' inquiries and terminate the encounter.

Moreover, Munoz had not previously cooperated or meaningfully interacted with the officers. Instead, she sat silently on the couch as Skillern and Purdy entered her home and began their protective sweep, and she did not communicate with them until she was asked to go to the bathroom. She never sought out the officers or left the living room to see what they were doing in the master bedroom or bathroom. And she cannot be considered to be particularly sophisticated since she cannot read or write in English and

left school when she was 12 years old.   Finally, at least two firearms had already been found before Munoz' encounter with police—thus, she could not reasonably have believed that no incriminating evidence would be found.

The Eleventh Circuit found involuntary consent under analogous circumstances in *United States v. Tovar-Rico*, where the police performed a protective sweep and the defendant "had already observed officers explore every room in the apartment [such that she] could not reasonably have known that she could still refuse a search." *United States v. Tovar-Rico*, 61 F.3d 1529, 1536 (11th Cir. 1995).   The retention of Munoz' passport during the encounter is another factor weighing heavily against the voluntariness of consent. *See Chemaly*, 741 F.2d at 1352.   So too is the differing treatment Munoz received when she was isolated from her daughters in the bathroom and questioned pointedly about her immigration status. *See id.* at 1353 (holding that different treatment and investigatory questions about one specific topic "intimate that an investigation had focused on a specific individual and easily could induce a reasonable person to believe that failure to cooperate would lead only to formal detention") (internal quotation marks and citation omitted). And, importantly, it is undisputed that Munoz was never told she could refuse to consent to a search at any point. *See id.* at 1352–53 ("While the government is not required to prove that [the consenting individual] knew he had the right to refuse to consent, such knowledge or lack thereof is a factor to consider in determining voluntariness.").   While none of these factors by itself necessitates a finding that the consent was involuntary, the totality of these circumstances does compel that result.   Accordingly, the court cannot conclude that

Munoz voluntarily consented to the search of her home.

This finding of involuntariness, in and of itself, invalidates the consent.   However, even assuming the consent was voluntary, the Government has not proven that it was not tainted by the prior illegal search.   In this context, the court must decide whether the causal connection between the illegality and consent had "become so attenuated as to dissipate the taint" such that the consent could be considered an act of free will. *Wong Sun v. United States*, 371 U.S. 471, 486 (1963).   The Eleventh Circuit has cautioned against a rigid, formulaic analysis of taint in favor of a "'pragmatic evaluation of the extent to which the illegal police conduct caused the defendant's response.'" *Delancy*, 502 F.3d at 1310. Even so, three criteria are prevalent in this analysis: "the temporal proximity of the seizure and the consent, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." *United States v. Santa*, 236 F.3d 662, 677 (11th Cir. 2000) (citations omitted).

The precise timing of Munoz' consent, like so much of this record, is unclear.   The court can only assume that the timing of the illegal search and the consent were relatively close—separated by a matter of minutes, if not seconds or occurring simultaneously.   And during the intervening time Munoz was not formally in custody or handcuffed but was directed to sit on the couch in the living room, and then to sit on the edge of the bathtub, with two officers blocking the front door of the home.   The temporal proximity weighs in favor of exclusion, but only slightly.   As in *Delancy*, "on these facts . . . timing is not the most important factor." *Delancy*, 502 F.3d at 1311.

The second factor asks whether intervening circumstances interrupted the causal connection between the illegal search and consent.   Here, Kocian's advisement of rights was a meaningful intervening circumstance only to the extent it shows Munoz' "awareness, at the time of her consent, of her rights under the *Fourth* Amendment." *See id.* at 1311–12. But Kocian repeatedly testified to advising Munoz of her rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), which is a Fifth Amendment case about self-incrimination.   And he confirmed that he never advised Munoz of her right to refuse consent to a search, nor did he provide her with a written form listing her rights.   Under these circumstances, the advisement of rights is not a material intervening circumstance. *See Delancy*, 502 F.3d at 1312 (noting that an advisement of rights has "probative value independent of the voluntariness issue" if it is directed towards Fourth Amendment rights, not merely Fifth Amendment rights).

Finally, the court must consider the purpose and flagrancy of the Government's conduct.   Having already concluded that an illegal search occurred, it is apparent that the officers "exploited the evidence found prior to consent" by displaying it to Munoz before asking for permission to search. *Id.* at 1313.   Munoz testified that both rifles had been found, and placed on her bed, when she was talking to the officers in her bathroom.   In addition to showing her the rifle, the officers presented her with her husband's documents that apparently had been seized elsewhere in the house, although the record does not clearly reflect the genesis of these documents.   This display of illegally procured evidence weighs heavily in favor of a finding that the consent is the fruit of the poisonous tree of the illegal

search. *See, e.g*, *id.* (quoting *Holloway v. Wolff*, 482 F.2d 110, 115 (8th Cir. 1973), for the proposition that placing a defendant "'face to face with the incriminating evidence'" obtained by a prior illegal search may taint her consent).   For all of these reasons, Munoz' consent to the search of her bedroom and bathroom, even if voluntary, was the product of the illegal search that preceded it.   Any items that might have been recovered pursuant to the consent search must be suppressed, and the prior illegal search is not cured by consent.

## IV.   CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge:

1.     That the Motion to Suppress (Doc. 30) be GRANTED to the extent it seeks the suppression of the hunting rifle, handgun, ammunition, documents identifying Solano-Mendoza as a citizen of Mexico, and information regarding the location and discovery of these items.

2.     That the Motion be DENIED in all other respects.

It is further ORDERED that the parties are DIRECTED to file any objections to this Recommendation on or before **July 9, 2018.**   Any objections filed must identify the specific findings in the Magistrate Judge's recommendation to which the party is objecting. Frivolous, conclusive, or general objections will not be considered by the district court. The parties are advised that this recommendation is not a final order of the court, and therefore it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the district

court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the district court except upon grounds of plain error or manifest injustice. *See Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); *Stein v. Reynolds Secs., Inc.*, 667 F.2d 33 (11th Cir. 1982).

DONE on the 29th day of June, 2018.

_____
GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE